Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173

*Attorneys for Plaintiff*
HUMBOLDT BAYKEEPER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBOLDT BAYKEEPER, a California non-profit association,<br><br>                    Plaintiff,<br><br>        v.<br><br>HUMBOLDT WASTE MANAGEMENT AUTHORITY, a Joint Powers Authority<br><br><br>                    Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Humboldt Baykeeper ("Baykeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

### I.        JURISDICTION AND VENUE

1.        This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.        On February 24, 2017, Baykeeper issued a 60-day notice letter ("Notice Letter") to Humboldt Waste Management Authority ("Defendant"), for a Facility under their control with Waste Discharger Identification Number I 12I01607. The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities

*(National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ)* ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit") and the Clean Water Act at the following waste facility: Hawthorne Street Transfer Station, 1059 W. Hawthorne Street, Eureka, CA 95501 ("the Facility"). The Notice Letter informed Defendant of Baykeeper's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.     The Notice Letter was sent to Defendant: Executive Director, Jilly Duffy; Compliance Officer, Neva Swan; and Chair of the Board of Directors, Jack Thompson, as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, North Coast Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.     More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. Baykeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.     Plaintiff also seeks relief from Defendant's violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## II.      **INTRODUCTION**

7.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

8.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive

and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

10.     Baykeeper specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.     PARTIES

### A.     Humboldt Baykeeper

11.     Plaintiff Humboldt Baykeeper ("Baykeeper" or "plaintiff") is a non-profit association dedicated to safeguarding coastal resources for the health, enjoyment, and economic strength of the Humboldt Bay community through education, scientific research, and enforcement of laws to fight pollution, with a focus on the Humboldt Bay watershed and coastal waters from Trinidad Head to the Eel River, including the Palco Wetlands and Humboldt Bay, into which Humboldt Waste Management Authority discharges polluted stormwater and non-stormwater. Baykeeper's office is located at 415 I St, Arcata, CA 95521.

12.     Baykeeper has over 1,000 members who live and/or recreate in and around the Humboldt Bay watershed and coastal waters. Baykeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Baykeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

13.     Baykeeper's members use and enjoy the waters near the Facility, including Humboldt Bay, to sail or boat, swim, kayak, windsurf, birdwatch, picnic, fish, hike, conduct scientific study and research, and/or for aesthetic enjoyment.

14.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted stormwater and non-stormwater from the Facility, negatively impacts and impairs Baykeeper's

[1] The Facility is fully described in Section V below.

Complaint for Declaratory and Injunctive Relief     4
and Civil Penalties

members' use and enjoyment of these waters.

15.     The interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

16.     Continuing commission of the acts and omissions alleged herein will irreparably harm Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.     The Owners and Operators of the Facility**

17.     Baykeeper is informed and believes, and thereon alleges, that Humboldt Waste Management is a Joint Powers Authority formed under the laws of the State of California.

18.     Baykeeper is informed and believes, and thereon alleges, that Jill Duffy, Neva Swan, Jack Thompson, and Humboldt Waste Management Authority, are owners and/or operators of the Facility.

19.     Collectively, Baykeeper refers to Jill Duffy, Neva Swan, Jack Thompson, and Humboldt Waste Management Authority as "the Owners and/or Operators," defined herein as the owners and/or operators of the Facility.

**IV.     STATUTORY BACKGROUND**

**A.     The Clean Water Act**

20.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

21.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

22.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source

dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

23.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

24.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

25.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

26.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

27.     "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

28.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

29.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

30.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v.*

*City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

31.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

32.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

33.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

34.     The Defendant are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

35.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

36.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA. *See* 33 U.S.C. § 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

37.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

38.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater

dischargers. *See id.*

39.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

40.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

41.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

42.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

43.     On July 1, 2015 the 2015 Permit became effective, and was issued as NPDES No. CAS000001 (the same NPDES permit number as the 1997 Permit). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

44.     In order to discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water

Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

45.    Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

### C.    The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

46.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

47.    Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

48.    Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

49.    Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National

Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

50.    The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: pH – 6.0 – 9.0 standard units "s.u."); TSS – 100 mg/L; lead ("Pb") – 0.069 mg/L; iron ("Fe") – 1.0 mg/L; Chemical Oxygen Demand ("COD") – 120 mg/L; aluminum ("Al") – 0.75 mg/L; copper ("Cu") – 0.0123 mg/L; and zinc ("Zn")– 0.117 mg/L. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

51.    The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

52.    Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

53.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

54.    Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

55.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

56.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

57.     The State Water Quality Control Board, North Coast Region (May 2011), has issued the Water Quality Control Plan for the North Coast Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan establishes that the dissolved oxygen levels of Humboldt Bay may not be depressed below 6.0 mg/L. Basin Plan, Table 3-1. The Basin Plan sets forth water quality objectives for dissolved metals, such as arsenic, zinc, copper, lead, and mercury. Id., Table 3.2. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. Id. The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms."

58.     While the Basin Plan does not specify beneficial uses for the Palco Wetlands, it does identify present and potential beneficial uses for Humboldt Bay, including but not limited to the following existing beneficial uses for Humboldt Bay: municipal and domestic supply, industrial service supply, navigation, commercial and sport fishing, preservation of rare and endangered species, wildlife habitat, spawning reproduction and/or early development, marine habitat ("MAR"), cold freshwater habitat ("COLD"), estuarine habitat, aquaculture, migration, shellfish harvesting, and contact and non-contact water recreation.

59.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies the Humboldt Bay is listed for the following CWA 303(d) impairments: Dioxin Toxic Equivalents and Polychlorinated biphenyls (PCBs).2 Thus, the receiving waters for pollution from the Facilities are impaired, and the Defendant's illegal discharges of pollutants above the WQS contributes to the continued impairment of Humboldt Bay's beneficial uses.

60.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

61.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

62.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

63.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

64.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

65.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

66.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial Facility. 1997 Permit, Section A(2); 2015 Permit, Section X.

67.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

68.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of

compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id.*

69.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

### E.     The Storm Water Permit's Monitoring and Reporting Requirements

70.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

71.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

72.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id.*, 1997 Permit Section B(2)(c) and B(2)(d).

73.     The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

74.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

75.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

76.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

77.     The Storm Water Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

78.     Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

79.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

80.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

81.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

82.     Section B(5)(c)(iii) and Table D of the 1997 Permit, require Facility classified as Standard Industrial Classification ("SIC") code 5093, such as the Facility, to also analyze stormwater

samples for chemical oxygen demand ("COD"), iron ("Fe"), zinc ("Zn"), aluminum ("Al"), copper ("Cu") and lead ("Pb"). 1997 General Permit, Table D; 2015 General Permit Tables 1-2.

83.   Section B(5)(c)(iii) and Table D of the 1997 Permit, require Facility classified as Standard Industrial Classification ("SIC") code 4953, such as the Facility, to also analyze stormwater samples for iron ("Fe"). 1997 General Permit, Table D; 2015 General Permit Tables 1-2.

84.   Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

85.   Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

86.   Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

87.   Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

88.   Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

89.   Table 1 of the 2015 Permit requires Facility under SIC code 5093, such as the Facility, to analyze stormwater samples for iron, lead, aluminum, zinc and COD. 2015 General Permit Tables 1-2. The Facility's June 2015 SWPPPs also requires testing for Copper ("Cu"), with reference in the SWPPP to SIC Code 5093.

90.     Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.     STATEMENT OF FACTS

### A.     The Hawthorne Street Transfer Station Facility Site Description

91.     The Facility is located at 1059 W. Hawthorne Street, Eureka, CA 95501. The Facility is located on an approximately 4.3-acre site that contains an enclosed commercial waste handling structure, which is separated into two designated areas for commercial and self-hauling unloading. The site also includes storage areas, an office building, parking areas and a tarped and loaded trailer staging area.

92.     Industrial operations and activities taking place at the Facility include but are not limited to: receiving, handling and transferring of: municipal solid waste; green waste; public drop-off of recyclables; electronic waste; carpet and padding; appliances; used motor oil & oil filters; used antifreeze; kitchen grease; tires and batteries; and California Redemption Value buyback (individuals trading recyclables for money). Large-haul waste is received at the site and materials are sorted. Tires are accepted. A Household Hazardous Waste collections facility and a Recycling Center are operated at the Facility. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") Code 4212, Trucking without Storage.

93.     The Facility discharges industrial stormwater pursuant to the General Permit through at least two discharge points, which flow into the Palco Wetlands, which discharge to Humboldt Bay. The Palco Wetlands and Humboldt Bay are waters of the United States within the meaning of the CWA. The Facility SWPPP lacks enough detail to identify stormwater flow patterns, discharge and drainage plans or infrastructure, or the location of the primary discharge points, listed in publicly available materials as "West Stormwater" and "South Stormwater".

94.     Baykeeper is informed and believes, and thereon alleges, that the Facility's areas

described herein, lack adequate cover or secondary containment, and certain industrial activities occur outside without adequate cover or secondary containment, resulting in discharges of polluted stormwater. Vehicle and other traffic at the Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris into waters of the United States.

### B.   Palco Wetlands / Humboldt Bay

95.   The Palco Wetlands (also known as Palco Marsh or Eureka Marsh) is a coastal wetland area adjacent to Humbodt Bay. The Palco Wetlands provide a habitat for a variety of species including numerous birds and plant-life.

96.   Humboldt Bay is home to the Humboldt Bay National Wildlife Refuge was created in 1971 primarily to protect and enhance the wetland habitats for migratory water birds using the bay waters, and is a key stopover for millions of birds that rely on the Pacific Flyway. The refuge has several different units totaling almost 4,000 acres. These units consist of a mosaic of mudflats, estuarine eelgrass meadows, saltmarsh, brackish marsh, seasonally flooded freshwater wetlands, riparian wetlands, streams, coastal dunes, and forest. These habitats support over 316 species of birds and 40 species of mammals. The refuge also provides habitat for approximately 100 species of fish and marine wildlife.

97.   Humboldt Bay is home to three species of salmonids: stealhead, coho salmon, and chinook salmon. All three species have experienced severe population declines and are listed as threatened under the Endangered Species Act, with coho also listed as "endangered" under the California Endangered Species Act. Tidewater goby, also a federally listed endangered species, has been found in several locations in Humboldt Bay. The bay is also home to other species whose populations have recovered such as the Aleutian Cackling Geese. Humboldt Bay and the adjacent wetlands provide precious habitat for the great diversity of birds, mammals, fish, amphibians, invertebrates, and plants. Invertebrates.

### D.   The Facility Storm Water Permit Coverage

98.   Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Facility submitted an NOI for coverage under the 1997 Permit.

99.   Baykeeper is not currently in possession of NOI or a SWPPP submitted prior to 2015, to

cover the Facility, but Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators previously submitted NOI(s) for coverage under the 1997 Permit. Further information about coverage under the 1997 permit will be sought in discovery.

100.    Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators submitted an NOI for its industrial operations at the Facility on or about June 29, 2015, for coverage under the 2015 Permit.

101.    The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number as I 12I01607. SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

102.    The NOI for the Facility identifies the receiving water for discharges and runoff from the Facility to be Palco Wetlands.

103.    Via search of the SMARTS database, Baykeeper obtained a SWPPP for the Facility dated June 2015 ("Facility SWPPP").

104.    Baykeeper is informed and believes, and thereon alleges, that the Facility' SWPPPs fail to describe and/or adequately describe all of the Facility industrial activities or processes.

105.    Baykeeper is informed and believes, and thereon alleges, that because the Facility's SWPPP fails to describe and/or adequately describe all of the Facility industrial activities, the Facility's SWPPP also fails to describe and/or adequately describe all of the significant materials and processes that are related to the Facility's industrial activities.

106.    Baykeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); BOD; TSS; benzene; pesticides; gasoline and diesel fuels; trash; fugitive and other dust and dirt; and O&G.

107.    Baykeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the Facility in the SWPPP, the Owners and/or Operators have not developed and/or implemented all appropriate BMPs.

108.     Baykeeper is informed and believes, and thereon alleges, that the Facility SWPPP includes no assessments and/or no adequate assessments of potential pollutant sources, the associated pollutants, and the corresponding BMPs at the Facility.

109.     Baykeeper is informed and believes, and thereon alleges, that the Facility SWPPP includes no description and/or no adequate description of the Facility BMPs, analyses of the effectiveness of the BMPs, or summaries of the BMPs by pollutant source.

110.     Baykeeper is informed and believes, and thereon alleges, that Owners and/or Operators have failed and continue to fail to develop the Facility SWPPP and site-specific BMPs consistent with Section A of the 1997 Permit, and Section X of the 2015 Permit.

111.     Baykeeper is informed and believes, and thereon alleges, that Defendant's Facility SWPPP fails and continues to fail to include an adequate: (1) list of significant materials handled and stored at the site; (2) description of potential pollutant sources including industrial processes, material handling and stockpiling areas, dust and particulate generating activities; (3) description of significant spills and leaks; or (4) list of all non-stormwater discharges and its sources; Section A of the 1997 Permit and Section X of the 2015 Permit.

112.     Baykeeper is informed and believes, and thereon alleges, that stormwater sampling at the Facility demonstrate that Facility's stormwater discharges contain concentrations of pollutants above the Benchmark Levels, including but not limited to aluminum, iron, zinc, COD, and TSS.

113.     Baykeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to stormwater and to prevent discharges of polluted stormwater and non-stormwater from the Facility.

114.     Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in the Facility's stormwater discharges, make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

115.     Baykeeper is informed and believes, and thereon alleges, that some of the Facility's

industrial operations are conducted outdoors without secondary containment or other measures to prevent polluted stormwater from discharging from the Facility.

116.    Baykeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas and offsite.

117.    Baykeeper is informed and believes, and thereon alleges, that trucks and vehicles leaving the Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease, pesticides, metal particulates, and other pollutants off-site.

118.    Baykeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted stormwater from the Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

119.    Baykeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with stormwater flows from the Facility into the Palco Wetlands and Humboldt Bay.

### E.    Stormwater Discharges at the Facility

120.    The Owners and/or Operators represent that there are two (2) discharge points at the Facility, called the Outflow Pipe. Information obtained from SMARTS lists "West Stormwater" and "South Stormwater" as the only sampling points tested in submitted laboratory sampling and testing reports. The Facility SWPPP provides no other discernable information regarding stormwater flow, stormwater collection inlets, sampling points, or stormwater discharge points.

### F.    The Facility's Stormwater Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

121.    Baykeeper is informed and believes, and thereon alleges, that pollutants from the Facility discharge from more than one discharge point into the Palco Wetlands and Humboldt Bay.

122. The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

123. Baykeeper is informed and believes, and thereon alleges, the Palco Wetlands and Humboldt Bay, the Receiving Waters herein, are waters of the United States, and/or a tributary to a traditionally navigable water.

124. Baykeeper is informed and believes, and thereon alleges, that polluted stormwater and non-stormwater discharges from the Facility to the Receiving Waters.

125. Stormwater discharges containing pollutants, including but not limited to, heavy metals such as zinc, aluminum, and iron adversely affect the aquatic environment.

126. Samples of stormwater discharges collected at the Facility contain pollutants including zinc, iron, aluminum, TSS, and COD, in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

127. Baykeeper is informed and believes, and thereon alleges, that during and/or after every significant rain event[3] or any other stormwater or non-stormwater discharge that has occurred at the Facility since February 24, 2012, through the present, Defendant have discharged and continue to discharge stormwater and non-stormwater from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the EPA Benchmarks, CTR, and the WQS.

**G. Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

128. Baykeeper is informed and believes, and thereon alleges, that Defendant failed and

---

[3] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

continues to fail to develop an adequate M&RP for industrial operations at the Facility that complies with Section B of the 1997 Permit, and Section XI of the 2015 Permit.

129.    February 24, 2012 is informed and believes, and thereon alleges, that Defendant failed and continue to fail to revise the M&RP for the Facility as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2105 Permit.

130.    Baykeeper is informed and believes, and thereon alleges, that Defendant have failed and continue to fail to collect samples during the first hour of the first storm event of the Wet Season over the past five years, in violation of Section B(5)(a) of the 1997 Permit and Section XI(B) of the 2015 Permit.

131.    Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continue to fail to analyze stormwater samples collected at the Facility for all toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharges, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

132.    Baykeeper is informed and believes, and thereon alleges, that Defendant have failed and continue to fail to demonstrate that stormwater sampling limited to those listed in the Facility's 2015 SWPPP, is representative of pollutants from the Facility, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

133.    Baykeeper is informed and believes, and thereon alleges, that Defendant have failed and continue to fail to sample stormwater discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

134.    Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continue to fail to adequately revise the M&RP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

135.    Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Facility consistently fail to perform visual observations of stormwater during QSEs.

136.    Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Facility have consistently failed and continue to fail to report any noncompliance with

the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

137.    Baykeeper is informed and believes, and thereon alleges, that Defendant's certifications of compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual Reports were in fact submitted, were erroneous because Defendant have not developed and/or implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the 1997 Permit.

138.    Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Facility consistently fail to collect stormwater samples during QSEs.

139.    Baykeeper is informed and believes, and thereon alleges, that Defendant have failed to submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Stormwater in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

140.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

141.    Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

142.    Baykeeper is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time stormwater discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

143.    The Owners and/or Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

144.    Baykeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

145.    Each day since at least February 24, 2012 that the Owners and/or Operators discharge stormwater containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

146.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 24, 2012 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

147.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

148.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Stormwater in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

149.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

150.    Baykeeper is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time stormwater discharges from the Facility.

151.    Baykeeper is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time stormwater discharges from the Facility.

152.    The Owners and/or Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

153.    Baykeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

154.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

155.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 24, 2012 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

156.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

157.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

158.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

159.   Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

160.   Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

161.   Baykeeper is informed and believes, and thereon alleges, that Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the Facility, in violation of the Storm Water Permit.

162.   The Owners and/or Operators have been in violation of the Storm Water Permit at the Facility every day from February 24, 2012 to the present.

163.   The Owners' and/or Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

164.   The Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

165.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

166.   By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 24, 2012 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

168.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

169.     Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

170.     Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop an adequate M&RP for the Facility, in violation of the Storm Water Permit.

171.     Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the Facility, in violation of the Storm Water Permit.

172.     Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Facility, in violation of the Storm Water Permit.

173.     The Owners and/or Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from February 24, 2012 to the present.

174.     The Owners' and/or Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

175.     The Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Facility.

176.     Each and every violation of the Storm Water Permit's M&RP requirements at the Facility is a separate and distinct violation of the CWA.

177.     By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 24, 2012 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

178.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

179.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

180.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

181.   Receiving Water Limitation C(3) of the 1997 Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to current BMPs in order to prevent or reduce any pollutant in stormwater discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, those BMPs must be implemented into the Facility SWPPP.

182.   Receiving Water Limitation C(4)(a) of the 1997 Permit requires the report to be submitted to the Regional Board no later than 60-days from the date the discharger first learns its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.

183.   Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board for the Facility, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

184.   Baykeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' Annual Reports for the Facility failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

185.    Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to submit complete Annual Reports for the Facility to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit.

186.    The Owners and/or Operators have been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least February 24, 2012.

187.    The Owners and/or Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit.

188.    The Owners and/or Operators have been in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit every day since at least February 24, 2012.

189.    The Owners' and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

190.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 24, 2012 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

191.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

192.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

193.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section

402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.     A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.     A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring since February 24, 2012, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.     A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.     Any other relief as this Court may deem appropriate.


Dated: April 25, 2017                          Respectfully submitted,




                                               _____
                                               Anthony M. Barnes
                                               AQUA TERRA AERIS LAW GROUP
                                               Attorneys for Plaintiff
                                               HUMBOLDT BAYKEEPER